UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                - v -

ZEPHANIAH DANTZLER,

                Defendant.
------------------------------------------------------------x

**REPORT AND RECOMMENDATION**

CR-12-568 (NGG)(VVP)

The defendant Zephaniah Dantzler has moved to suppress evidence in this criminal case, in which he is charged with being a felon in possession of a firearm, and Judge Garaufis has referred the motion to me for a report and recommendation pursuant to title 28, United States Code, Section 636(b)(1)(B). Specifically, Dantzler seeks (1) to suppress two sets of post-arrest statements on the ground that they were obtained by unlawful interrogation in violation of his Fifth Amendment rights, and (2) to suppress the firearm that underlies the criminal offense with which he is charged on the ground that it was the product of an unlawful search and seizure in violation of his Fourth Amendment rights. The parties have submitted briefs in support of their respective positions, and the court conducted an evidentiary hearing on January 7, 2013. For the reasons below, I recommend that the motion be granted in part and denied in part.

## FACTS

I make the following factual findings based on the evidence presented at the hearing. The defendant was arrested on August 4, 2012 by two New York City police officers – Patrick Enriquez and Omayemi Gatling – who were acting in response to a 911 call. The 911 call was made at approximately 1:00 p.m. by a woman named Muniz who told the 911

dispatcher that Dantzler, who resided with her, was in possession of a firearm in the apartment that they shared. She told the dispatcher that Dantzler had a violent history of abuse, and that Dantzler had formerly been her boyfriend but was now only her roommate. She also told the dispatcher that Dantzler was present in the apartment and that the firearm was on the bed in their apartment. After assuring Muniz that police would arrive as soon as possible, the dispatcher put out a call for assistance. Officer Gatling, who was on patrol with his partner Officer Enriquez, responded to the call. The dispatcher advised him that he would be responding to a domestic dispute involving family members and that the situation involved a gun that was possessed by a boyfriend.[1] Gatling asked whether the gun was displayed. The dispatcher immediately made a call back to Muniz, who again confirmed that the gun was on the bed and added that Dantzler was in the apartment, having just emerged from the shower. The dispatcher relayed that information to Gatling.

Upon arriving at the address given to them by the dispatcher, Officers Gatling and Enriquez encountered Muniz on the street outside the apartment building where she lived. She was agitated. She advised them that her boyfriend was upstairs in her apartment and that he had a gun on the bed. She let them into the building, and then went upstairs with them to the second floor where her apartment was located. She then let them into the apartment using her key, and followed them into the apartment.

As the officers entered the apartment they saw the living room and a doorway to another room which turned out to be the bedroom. The doorway had no door, but the view

---

[1] The communications between the dispatcher and Gatling included various police codes which were explained by the officers during the hearing.

into the room was obstructed by a partition or curtain of some sort. As the officers made their way into the living room the defendant emerged from the bedroom. The officers restrained him immediately, handcuffed him and placed him on the sofa in the living room. Officer Gatling asked Muniz where the gun was located, and she responded by pointing to the bedroom from which the defendant had just emerged. Gatling entered the room and saw the gun in the center of the bed, uncovered and in plain view. He retrieved the gun, a 9 mm Ruger loaded with ammunition, and returned to the living room where the defendant remained seated, watched by Officer Enriquez.

At that point, the defendant was speaking to Muniz, in essence complaining about her having called the police. Gatling asked Dantzler whether the gun belonged to him, and Dantzler confirmed that it did, adding that he had intended to "take it in." The officers then got in touch with their supervisor, who came to the apartment with his driver. At some point before the supervisor arrived, Officer Enriquez entered the bedroom while Gatling remained with the defendant, and observed three bullets on a shelf which he retrieved. Eventually Officers Enriquez and Gatling returned to the precinct where they lodged the defendant.

At the precinct, Gatling, as the arresting officer, began the task of completing paperwork and seeing that the necessary notifications about the arrest were made. These included a notification to a New York Police Department detective involved with Trigger Lock, a program under which firearms offenses are sometimes referred for federal prosecution. For his part, Officer Enriquez returned to patrol. Neither of them spoke to

any federal agents that day or at any other time before the case was referred for federal prosecution several days later.

One of the notifications that was made (Gatling did not recall whether or not he made the notifications personally) went to the Gun Enhancement Unit, a division within the New York Police Department that focuses on firearms offenses. As a result of that notification, Detective Brian Ujvary of that unit traveled to Brooklyn Central Booking where the defendant had been taken, and interviewed him at about 8:35 p.m that evening. Although he had reviewed some of the paperwork related to the arrest, Ujvary had not spoken to Officers Gatling or Enriquez prior to the interview and was unaware of any statements the defendant had made. Before commencing the interview, Ujvary explained the *Miranda* warnings to the defendant one by one, using a form on which the warnings were printed. The defendant responded that he understood each of the warnings by circling and initialing the word "Yes" after each warning. He then signed the form at the bottom, and the form was countersigned by Ujvary and his partner Detective John Miata, who witnessed the interview. During the ensuing interview the defendant made a number of statements including statements acknowledging that the firearm that had been seized in the apartment belonged to him.

## DISCUSSION

As noted above, the defendant has moved to suppress two sets of post-arrest statements that he made concerning his possession of the gun found in the apartment on the ground that they were obtained in violation of his Fifth Amendment rights. He also seeks to

suppress the evidence found in the apartment on the ground that it was seized in violation of his Fourth Amendment rights. The various items of evidence are addressed in turn below.

**1.**     *The Post-Arrest Statements in the Apartment*

There is no dispute that the defendant did not receive *Miranda* warnings before he made statements in the apartment in response to questions posed by Officer Gatling concerning his ownership and possession of the gun. In recognition of that fact, the government has advised that it will not seek to use the statements in its case-in-chief at trial. Accordingly, the defendant's motion to suppress should be granted with respect to those statements, understanding of course that the statements might nevertheless be used for impeachment purposes should the defendant "open the door." *See Harris v. New York*, 401 U.S. 222 (1971).

**2.**     *The Post-Arrest Statements at Brooklyn Central Booking*

It is also undisputed that *Miranda* warnings were properly given to the defendant before he was interrogated by Officer Ujvary at Brooklyn Central Booking later in the evening after his arrest. The defendant nevertheless makes two arguments in support of suppression of those statements. He contends first that the statements were the unlawful product of a two-step interrogation process condemned by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). Second, he contends that the statements were obtained in violation of the statutory rule limiting the use of statements taken from defendants more than six hours after arrest. *See* 18 U.S.C. § 3501(c).

In *Missouri v. Seibert* the Supreme Court addressed a growing practice employed by law enforcement authorities throughout the country in which they first obtained inculpatory statements from a criminal suspect by interrogating him before giving any *Miranda* warnings. Then, after a brief interruption and the administration of *Miranda* warnings, they would obtain a fresh set of inculpatory statements that could be used as evidence at trial. The Court held that such a strategy deliberately undermined the purpose of the *Miranda* warnings and rendered inadmissible all statements obtained from the defendant, including those made after the warnings were given. 542 U.S. at 617. In reaching its decision, however, the Court carefully distinguished its earlier decision in *Oregon v. Elstad*, 470 U.S. 298 (1985), where it permitted the use of post-*Miranda* warning statements made by a defendant who had previously made incriminating statements in response to questioning by an officer who had not given the defendant the warnings.

The Second Circuit has interpreted *Seibert* as an exception to *Elstad*, and has concluded that post-warning confessions are inadmissible only if they are the consequence of a deliberate, two-step strategy. *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) (citing *United States v. Carter,* 489 F.3d 528, 536 (2d Cir. 2007)). As a result, the test for determining the admissibility of post-warning statements in such situations in this Circuit (and in the other circuits that have addressed the issue), is the one articulated by Justice Kennedy in his concurring opinion in *Seibert*:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be

> excluded unless curative measures are taken before the postwarning statement is made.

*Carter*, 489 F.3d at 535-36 (quoting *Seibert*, 542 U.S. at 622); *accord, Williams*, 681 F.3d at 41. It is the government's burden to disprove by a preponderance of the evidence that it employed a deliberate two-step strategy aimed at depriving the defendant of his Fifth Amendment protections. *E.g., Wlliams*, 681 F.3d at 41; *United States v. Moore*, 670 F.3d 222, 229 (2d Cir.), *cert. denied*, 133 S. Ct. 48, 183 L. Ed. 2d 691 (2012)

The evidence offered by the government establishes conclusively that the post-warning statements at issue here were not the product of a two-step interrogation strategy. The officer who obtained the pre-warning statement from the defendant in the apartment had nothing to do with the post-warning statements obtained many hours later by a different officer. There is no evidence that the two officers were working in tandem, or that they even spoke to one another. The statement by the defendant acknowledging possession of the gun in the apartment was obtained in response to a brief, almost casual, question by Officer Gatling, and was not pursued in any manner. Indeed, at the hearing Officer Gatling did not specifically recall having asked the question; it was his partner Officer Enriquez who remembered the exchange.

The contrast between the situation here and the situation condemned in *Seibert* could not be starker. In *Seibert*, the pre-warning and post-warning interrogations were both conducted at the police station by the same officer. The pre-warning interrogation was "systematic, exhaustive, and managed with psychological skill." 542 U.S. at 616. The pause between the pre-warning and post-warning interrogations was only 15 to 20 minutes, and the

post-warning interrogation was treated as merely a continuation of the pre-warning interrogation, as the officer repeatedly referred to pre-warning statements made by the defendant. Nothing of the sort occurred here. The officers were different; the statements were made at two different locations; the pre-warning exchange (it can hardly be characterized as an interrogation) was neither systematic nor exhaustive; many hours separated the two statements; and the post-warning interrogation made no reference to the prior statement made by the defendant. There is simply no basis to conclude that the post-warning statements here ran afoul of *Seibert*.

As for the defendant's second argument, the Supreme Court has squarely held that the six-hour rule in section 3501(c) does not apply to statements made by defendants held on state charges, even if their conduct also violated federal law. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994). There is no dispute that when the defendant made his post-warning statements at Brooklyn Central Booking he was being held solely on state charges. Indeed, federal charges were not lodged against him until several days later. Since section 3501(c) does not apply, it furnishes no basis to suppress the defendant's statements.

In dicta, the Court in *Alvarez-Sanchez* suggested that an exception to their decision might arise if local authorities, acting in collusion with federal authorities, arrested and detained a defendant on state charges solely to allow federal authorities to interrogate him beyond six hours in violation of the defendant's rights under sections 3501(c). 511 U.S. at 359. Merely contacting federal authorities about possible federal charges, however, would not constitute such collusion. *Id.* Here, the police apparently did notify federal authorities

on the day of the defendant's arrest, but there is no evidence whatsoever that federal authorities were involved in any way in the interrogation of the defendant at Brooklyn Central Booking, nor is there any evidence whatsoever of any other kind of collusion between federal and local authorities in violation of the defendant's rights.

**3.**   *The Firearm and Ammunition*

The defendant contends that the firearm and ammunition found in the bedroom must be suppressed as the product of a warrantless search. There is no dispute that the police had no warrant, and it is of course true that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 561 U.S. ___, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011) (internal quotations omitted) (*quoting Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006)). There are, however, reasonable exceptions to the warrant requirement, *King*, 131 S. Ct. at 1856, and several of them apply here.

A warrantless search and seizure is lawful if conducted with the consent of a person who has the authority to give consent by reason of her "common authority over or other sufficient relationship to the premises." *United States v. McGee*, 564 F.3d 136, 138-39 (2d Cir. 2009) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). Moreover, consent to search is valid as long as the person giving consent "reasonably appeared to the police to possess authority to consent to the search." *McGee*, 564 F.3d at 139 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). Here, the evidence fully supports a finding that Muniz not only consented to the search and seizure that produced the weapon and ammunition found in the

bedroom, but also had full authority to do so. She telephoned 911 for the express purpose of having the weapon removed from her apartment. She met the officers outside the building where her apartment was located, and told them that the gun was located on the bed in the bedroom. She then let them into the building, went up the stairs with them, and opened the door to her apartment. Before entering the building, the officers verified with her that she was the lessee of the apartment, a fact confirmed by her possession of keys that provided them with access to the building and her apartment. Once they entered the apartment, and the officers asked Muniz where the gun was located, she pointed to the bedroom with the obvious purpose of facilitating the retrieval of the gun. Muniz's conduct throughout the episode constitutes complete consent to the entry into her apartment, as well as the bedroom, and the seizure of the gun found there.

The defendant did not testify. In his affidavit in support of the motion, however, he refers to the bedroom as "his" bedroom, thus suggesting that Muniz did not have authority to give consent to the officers to enter it. No evidence was offered at the hearing to support that suggestion. But accepting for the sake of argument that Muniz did not have actual authority to consent to the entry into the bedroom, she certainly had apparent authority to do so. The question whether someone has apparent authority to give consent "must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. at 188 (ellipsis in original, internal quotation marks omitted) (*quoting Terry v. Ohio*, 392 U.S.1, 21-22 (1968)). As noted above, at the time

the officers entered the bedroom, they had been told by Muniz that the apartment was hers, a fact confirmed by her ability to give them entry to the apartment, and that the defendant was her boyfriend.  There was only one bedroom in the apartment of which they were aware.  By any objective standard, that information gives rise to the reasonable conclusion that Muniz had common authority over the bedroom and could consent to the officers' entry into it.  Moreover, at no time did the defendant voice any objection on either of the two occasions when the officers entered the bedroom – first, when Officer Gatling retrieved the gun from the bed and later when Officer Enriquez retrieved several bullets from the bookshelf.  In these circumstances, the officers reasonably believed that they had been given consent to enter the bedroom by someone who had the authority to do so, and to seize the evidence found there in plain view.

Even if the entry into the bedroom was an unconstitutional intrusion on the defendant's Fourth Amendment rights, the inevitable discovery doctrine would permit the use at trial of the evidence obtained there.  That doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.' " *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (*quoting Nix v. Williams*, 467 U.S. 431, 444 (1984)).  Deciding whether the doctrine applies "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992) (emphasis in original).

There is little doubt that if the officers had not entered the bedroom to seize the weapon they found there, they would have successfully obtained a warrant to do so. By the time they entered the room they already had substantial information providing probable cause for a warrant. The police had received a 911 call from a person who identified herself by name, provided her phone number, and gave the dispatcher specific information not only about the fact that a weapon could be found in her apartment, but also precisely where it could be found. When police arrived at the address given by the caller, she confirmed the information she previously provided to the 911 dispatcher and corroborated her residence in the apartment by providing the police with access to it with her keys. Once inside, she pointed specifically to the bedroom in the apartment where the gun could be found. This information, provided by a person who had proved to be reliable, was sufficient to establish probable cause that a gun was present in the bedroom, and there was no suggestion that the defendant or anyone else had a valid permit to possess it. Had they not entered the room, the officers would undoubtedly have conducted a criminal history inquiry concerning the defendant and ascertained that he had previously been convicted of felonies. These facts are more than sufficient to establish the necessary probable cause for a search of the bedroom. On facts remarkably similar, the court in *United States v. Simmons*, 861 F. Supp. 2d 307, 312 (S.D.N.Y. 2012), reached the same conclusion.

Other exceptions to the warrant requirement permit use of the evidence seized by the police. As noted earlier, before arriving at the apartment the police officers here had been advised by the dispatcher that they were responding to a domestic dispute involving people

with intimate relationships with one another, and that a gun was present. Numerous courts have recognized the dangers posed in such situations. *See, e.g. United States v. Miller*, 430 F.3d 93, 100-01 (2d Cir. 2005); *United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004); *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The volatility inherent in the emotionally charged circumstances surrounding such disputes necessitates particular care by the police to neutralize the dangers posed by the presence of weapons. Thus it was entirely reasonable for the officers to enter the bedroom and secure the weapon that was in plain view on the bed. Even though the defendant was already handcuffed, the presence of the weapon continued to pose a danger. The officers had no way of knowing whether the dispute about which they had been advised might erupt and result in use of the weapon, if not by the defendant, then by the woman who had summoned them or even someone else who was in the apartment or who might thereafter arrive. Although nothing in Muniz's manner up to that point suggested that she would do so, this was their first encounter with both her and the defendant and the officers should not have been expected to run the risk that a loaded firearm in the apartment might be turned against the defendant, or them for that matter, while they waited for their supervisor to arrive and for a warrant to be obtained. At a minimum, officers in such circumstances should be provided the latitude to conduct a cursory examination of the room where they have been told a firearm would be found in plain view on the bed. The protective sweep and plain view doctrines thus supply additional rationales for the lawfulness of the seizure here. *See, e.g.,* 430 F.3d 93, 99 (2d Cir. 2005).

The public safety exception to *Miranda* recognized by the Supreme Court provides yet further support for the premise that the officers' conduct here was entirely reasonable and that the firearm is admissible. The public safety exception permits the use of evidence obtained by interrogations conducted without *Miranda* warnings – including both incriminating statements and firearms that are discovered as a result – if the questioning is directed at obtaining information to protect the safety of the police or the public. *See United States v. Estrada*, 430 F.3d 606, 610 (2d Cir. 2005). Thus, for example, in *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court decision that first articulated the exception, the police were investigating a gunpoint rape and arrested a suspect who met the description given by the victim. Without giving him *Miranda* warnings, they asked him where the gun was, to which the suspect responded by pointing to a cardboard box and saying "the gun is over there." 467 U.S. at 651-52. Citing the danger posed by the possible presence of the weapon, the Court deemed the statement and the firearm to be admissible because the questions by which they were obtained were prompted by reasonable concern for public safety and were not posed primarily to obtain testimonial evidence. 467 U.S. at 656. A series of Second Circuit cases have now applied the exception in a variety of circumstances where the presence of firearms posed a danger to the safety of the police or the public. *See, e.g., United States v. Ferguson*, 702 F.3d 89, 95-96 (2d Cir. 2012); *Estrada*, 430 F.3d at 612-13; *United States v. Newton,* 369 F.3d 659, 677-79 (2d Cir. 2004); *United States v. Reyes,* 353 F.3d 148, 152-55 (2d Cir. 2003); *see also United States v. Khalil,* 214 F.3d 111 (2d Cir. 2000).

Although the circumstances here are different in that the seizure of the firearm did not occur as a result of incriminating statements obtained without *Miranda* warnings, there are important lessons in the public safety exception cases that are equally applicable here. The police here were responding to a report of a domestic dispute involving a gun, a situation with well-recognized risks of danger. For their own safety then, securing the weapon once they arrived was a paramount concern. After they had handcuffed the defendant, if they had asked him, rather than Muniz, where the handgun was, the public safety exception would almost certainly apply and his statements and the weapon would be admissible. *Compare, e.g., Newton,* 369 F.3d at 677-79. That it was Muniz who told them where the gun was located rather than the defendant should not alter the result.

Accordingly, for all of the foregoing reasons, the motion to suppress the handgun and ammunition seized at the apartment should be denied.

## Conclusion

The defendant's motion to suppress evidence should be granted to preclude the government from using in its case-in-chief any statements obtained from the defendant in the apartment in response to questions posed by the officers, but denied with respect to the evidence that was seized at the apartment and the statements made at Brooklyn Central Booking.

\*        \*        \*        \*        \*        \*

Any objections to this Report and Recommendation must be submitted to Judge Garaufis within 14 days of receipt of this report. Failure to file objections within the specified time may constitute a waiver of the right to appeal any judgment or order entered

by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *but cf. DeLeon v. Strack*, 23 F.3d 84, 86-87 (2d Cir. 2000); *United States v. Male Juvenile*, 121 F.3d 34, 37-39 (2d Cir. 2000).

**Respectfully recommended,**

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:  Brooklyn, New York
        February 7, 2013