UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**

**12-CR-568 (NGG) (VVP)**

-against-

ZEPHANIAH DANTZLER,

                Defendant.

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are Defendant Zephaniah Dantzler's objections to Magistrate Judge Viktor V. Pohorelsky's Report and Recommendation ("R&R"). Judge Pohorelsky recommended that the court grant in part and deny in part Defendant's motion to suppress: (1) the firearm and ammunition seized at the apartment where he lived; (2) Defendant's statements made to police at the apartment; and (3) Defendant's statements made to police at Brooklyn Central Booking. For the reasons set forth below, Judge Pohorelsky's R&R is ADOPTED IN PART; Defendant's motion is GRANTED IN PART and DENIED IN PART.

**I.     BACKGROUND**

Defendant is charged by a one-count indictment with possession of a firearm, having previously been convicted a felony, in violation of 18 U.S.C. § 922(g)(1). (Indictment (Dkt. 9).)

On August 4, 2012, at approximately 1:07 p.m., a woman identified as the "CW" in the Complaint called 911. (See Compl. (Dkt. 1) ¶ 2[1]; see also Gov't Ex. 2.[2]) The CW told the 911

---

[1]     The Complaint's paragraphs are mis-numbered. The court's citations refer to the paragraphs' actual order, not the notations used in the Complaint. For instance, the fourth actual paragraph, which is numbered "3," is cited herein as "¶ 4."

1

operator that Defendant, her roommate with whom she previously had a romantic relationship, owned a gun that was on top of "the" bed. (Gov't Ex. 2.) She requested police assistance because she did not want to be arrested for illegal gun possession or for the gun to discharge. (Id.)

The 911 dispatcher radioed New York Police Department ("NYPD") Officers Patrick Enriquez and Omayemi Gatling. (See Jan. 7, 2013, Mot. to Suppress Hr'g Tr. (Dkt. 39) ("Tr.") at 36:19-38:6, 121:1-17; see also Gov't Exs. 3-A, 3-B.[3]) Officers Enriquez and Gatling were told that there was a family dispute involving a firearm in progress at 255 Martense Street in Brooklyn, New York. (See Gov't Ex. 3-B; Tr. at 42:16-44:1, 121:15-122:15.) The 911 operator specifically told the officers that the CW had stated that her "boyfriend" possessed a gun on top of "the" bed. (Gov't Ex. 3-B.) While en route to the building, Officer Gatling had the 911 dispatcher confirm with the CW that there was in fact a gun involved. (Gov't Ex. 3-B; Tr. at 45:6-19.) The CW confirmed that the gun was on top of the bed; the 911 operator relayed this to Officers Enriquez and Gatling before they arrived at 255 Martense Street. (Gov't Ex. 3-B.)

The CW met the officers outside the apartment building. (Tr. at 45:20-46:1, 124:1-13.) Visibly upset, the CW stated that she had called 911 because her boyfriend owned a gun, which was then on the bed in the bedroom. (Id. at 46:2-47:1, 74:8-24, 75:23-25, 124:6-13, 129:19-130:1, 139:25-140:11, 156:12-16.) Officer Gatling asked the CW who "legally lived" in the apartment "to make sure that [he and Officer Enriquez] ha[d] the legal right to be inside that apartment." (Id. at 47:2-9.) The CW stated that the apartment was "hers," i.e. that she was renting the apartment. (Id. at 47:10-12, 74:25-75:9.) Given this interaction, the police believed

---

[2]  Citations to Government exhibits refer to the evidence admitted at the suppression hearing.

[3]  Government Exhibit 3-B, a collection of radio dispatch messages, is a subset of Exhibit 3-A that eliminates dead air time. (See Tr. at 38:7-40:6.)

2

that the CW and Defendant "were boyfriend and girlfriend and [that] they were possibly living together." (Id. at 47:13-24.)

The CW opened the apartment building door with her keys and led the officers inside. (See id. at 47:25-48:8; cf. id. at 124:18-24.) Guns drawn, the officers approached the apartment door. (Id. at 48:13-20, 125:15-22.) The CW then opened the apartment door with her keys and let the officers in; the CW remained behind the officers. (Id. at 48:21-49:15, 125:7-11, 126:1-10.) The police entered the living room of the apartment and saw that at the other end of the room there was another room that was separated by a sheet or curtain. (Id. at 49:17-50:1, 126:11-18.) The CW told the police that her boyfriend was in the room behind the sheet. (See id. at 50:2-14.) As the officers approached the partition, Defendant emerged from behind the sheet. (Id. at 50:15-21, 126:19-25.) The officers then handcuffed Defendant and placed him on the sofa in the living room. (Id. at 50:15-52:11, 86:25-87:24, 126:22-127:12; see Def. Aff. (Ex. 1 to Nov. 27, 2012, Def. Ltr. (Dkt. 26-1)) ¶ 3.)

With Defendant handcuffed, on the couch, and under Officer Enriquez's watch, Officer Gatling asked the CW where the gun was located. (Tr. at 52:12-18, 127:11-19; see Def. Aff. ¶¶ 3-4.) The CW pointed towards the room that had been separated by the sheet, which the officers could now see was a bedroom.[4] (See Tr. at 52:12-15, 53:8-12, 84:24-85:2; Def. Aff. ¶ 4; cf. Tr. at 130:4-13.) Officer Gatling could not tell whether it was a man's bedroom. (Tr. at 88:23-25.)

Without having obtained a warrant,[5] Officer Gatling entered the bedroom and observed a

---

[4] Officer Gatling could not recall whether the sheet that had separated the bedroom and the living room had fallen or if it had been pulled aside, but was certain that he could see into the bedroom from the living room. (Tr. at 52:19-53:4.)

[5] Neither Officer Gatling nor Officer Enriquez testified that they would have sought to obtain a warrant had they thought one was necessary. Indeed, neither has ever procured a single search warrant before. (See Tr. 92:8-93:1 (Gatling), 151:13-152:18 (Enriquez).)

3

firearm sitting atop the bed. (Id. at 53:2-15; see id. at 127:13-15.) Officer Gatling grabbed the gun (which was loaded), emerged from the bedroom, and heard Defendant complaining to the CW about her having called the police. (Id. at 53:19-55:7.) Officer Gatling then asked Defendant, in sum and substance, whether the gun belonged to him. (Id. at 55:8-12, 128:17-22.) Defendant affirmed that it was, but added that he intended to "tak[e it] back in" to the local police precinct. (See id. at 128:20-24, 148:16-149:5; Def. Aff. ¶ 6.). No Miranda warnings were given prior to this exchange. (See Def. Aff. ¶ 6.)

After this interaction, believing that he had the CW's consent, Officer Enriquez entered the bedroom.[6] (Tr. at 129:11-18.) Officer Enriquez noticed three bullets on a shelf, seized them, and gave them to Officer Gatling for processing. (See id. at 130:21-131:19, 132:2-15.)

After informing their supervisor of the arrest, the officers took Defendant back to the police station where Officer Gatling processed the paperwork and, per NYPD policy, informed various NYPD personnel of the arrest. (See id. at 95:7-97:4, 98:7-99:4.) As part of this notification process, Detective Brian Ujvary of the Gun Enhancement Unit was informed by administrative staff of Defendant's arrest. (See id. at 162:17-22; cf. 174:19-175:6.) At Brooklyn Central Booking (where Defendant had since been transferred), Detective Ujvary checked Defendant's criminal history, noticed that he had been previously convicted of multiple felonies, and knew that per NYPD policy he would later notify a member of the Trigger Lock program, a joint endeavor between federal and local law enforcement, that Defendant's case was eligible for federal prosecution. (See id. at 169:16-25, 180:7-19, 181:16-182:19, 182:17-22.)

At approximately 8:35 p.m., Detective Ujvary—without speaking to either Officer

---

[6] Defendant claims that Officer Enriquez believed he had the CW's consent to search the bedroom only because she allowed him into the apartment. (Def. Obj. (Dkt. 41) at 2.) To the contrary, he testified repeatedly that he believed he had the CW's consent to specifically enter the bedroom. (See Tr. at 129:17-18, 130:4-7.) Indeed, Defendant himself swore that the CW "walked into [his] bedroom and told the officers 'it's right here.'" (Def. Aff. ¶ 4.)

4

Gatling, Officer Enriquez, or being aware of Defendant's prior statements (id. at 163:10-23, 175:18-23, 176:16-20)—warned Defendant of his Miranda rights, which Defendant voluntarily waived (id. at 164:14-166:18; see Gov't Ex. 4; Def. Aff. ¶ 7). Detective Ujvary, with Detective John Miata also present, then questioned Defendant for approximately forty-five minutes about how he obtained the firearm and whether he knew of any other illegal gun activity. (See Tr. at 160:21-161:10, 166:19-167:5; Def. Aff. ¶ 7.) Defendant gave conflicting stories about how he obtained the gun, but eventually stated that he took it from a storage locker in Brooklyn. (See Tr. at 167:15-24.) After the interrogation, Detective Ujvary informed Detective David Joel, a member of the Trigger Lock program, that Defendant's case was eligible for federal prosecution. Detective Joel referred the case to the United States Attorney's Office, which it ultimately accepted. (See id. at 181:18-23, 182:17-22.)

### B. Procedural History

On August 9, 2012, Detective Joel filed the Complaint in this court. (Compl.) Magistrate Judge James Orenstein issued a federal arrest warrant that same day. (Arrest Warrant (Dkt. 2).) Defendant was then arrested and arraigned on the federal charge on August 10, 2012. (See Aug. 10, 2012, Minute Entry (Dkt. 3).)

On October 19, 2012, Defendant moved to suppress: (1) the gun and ammunition seized from the bedroom; (2) Defendant's statements made to police at the apartment; and (3) his statements made to police at Brooklyn Central Booking. (Dkt. 17.) On November 20, 2012, the court referred this motion, including Defendant's request for an evidentiary hearing, to Judge Pohorelsky for an R&R pursuant to 28 U.S.C. § 636(b)(1)(B). (Nov. 20, 2012, Order; see Nov. 20, 2012, Minute Entry (Dkt. 27).)

Judge Pohorelsky granted Defendant's request for an evidentiary hearing, which was

conducted on January 7, 2013. (See Jan. 7, 2013, Minute Entry (Dkt. 35).) The Government called three witnesses: Officer Gatling, Officer Enriquez, and Detective Ujvary. Defendant called only Detective Miata.

On February 7, 2013, Judge Pohorelsky issued his R&R, recommending that Defendant's motion be granted in part and denied in part. (R&R (Dkt. 38).) Specifically, Judge Pohorelsky advised denying Defendant's motion to suppress the gun and bullets on five alternate grounds: (1) the CW had actual authority to consent to the search of the bedroom; (2) even if she lacked actual authority, she had apparent authority to consent; (3) the police would have "inevitably discover[ed]" the evidence; (4) the protective sweep doctrine, combined with the plain view rule, together justify the search; and (5) the public safety exception to the warrant requirement also justifies the search. (Id. at 9-15.) Judge Pohorelsky recommended denying Defendant's motion to suppress the statements made at Brooklyn Central Booking because: (1) the police did not use an unlawful two-step interrogation method condemned by the Supreme Court in Missouri v. Seibert, 542 U.S. 600 (2004); and (2) 18 U.S.C. § 3501(c)'s proscription against the admission of statements made more than six hours after arrest does not apply. (R&R at 5-9.) Finally, Judge Pohorelsky recommended granting Defendant's motion to suppress the statements he made at the apartment because the Government had advised that it would not seek to use those statements in its case-in-chief. (Id. at 5; see also Gov't Mem. (Dkt. 20) at 36 ("With respect to the defendant's motion to suppress statements made by the defendant to officers in the apartment, the government agrees not to introduce those statements at trial in its case-in-chief.").)

On March 1, 2013, Defendant filed timely objections to Judge Pohorelsky's R&R.[7] (Def. Obj.) In addition to "continu[ing his] motion to suppress both the firearm, bullets, and

---

[7] The court granted Defendant's request to extend his time to object to Judge Pohorelsky's R&R to March 1, 2013. (Feb. 22, 2013, Order.)

6

statements [sic] taken in this case," Defendant specifically objected to Judge Pohorelsky's determination that: (1) 28 U.S.C. § 3501(c) does not preclude Defendant's statements made at Brooklyn Central Booking; (2) the inevitable discovery rule allows the admission of the firearm and bullets seized from the apartment; (3) the public safety exception to the warrant requirement justifies the search; and (4) the protective sweep and the plain view doctrines, when applied together, also justify the search of the bedroom. (Id. at 1-3.)

## II. STANDARD OF REVIEW

The standard of review of a magistrate judge's R&R addressing a criminal defendant's motion to suppress depends upon the parties' objections. Cf. 28 U.S.C. § 636(b)(1)(B) (authorizing a magistrate judge to "conduct hearings, including evidentiary hearings, and to submit . . . proposed findings of fact and recommendations for [a motion to suppress evidence in a criminal case]"). The court must "make a de novo determination of those portions of the report or . . . recommendations to which objection[s] [have been] made." 28 U.S.C. § 636(b); see also United States v. Burke, No. 09-CR-135 (SJ), 2011 WL 2609837, at *1 (E.D.N.Y. July 1, 2011). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b). Those portions of the R&R to which there is no specific reasoned objection are reviewed for clear error. See United States v. Houston, No. 12-CR-62 (ADS) (ETB), 2013 WL 125929, at *1 (E.D.N.Y. Jan. 5, 2013) (reviewing an unobjected to R&R that recommended denying a motion to suppress for clear error).

## III. DISCUSSION[8]

### A. Firearm and Ammunition Seized From the Bedroom

The Fourth Amendment prohibits "unreasonable" searches and seizures. U.S. Const. am. IV. "[T]he Supreme Court has . . . admonished that a warrantless search is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007) (second alteration in original) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). One such exception is where "proper consent [has been] voluntarily given." United States v. Matlock, 415 U.S. 164, 165-66 (1974).

Typically, a criminal defendant's consent validates the warrantless search. But valid consent may also be given by someone other than the defendant if that person "ha[d] authority to consent by reason of that person's 'common authority over or other sufficient relationship to the premises.'" United States v. McGee, 564 F.3d 136, 139 (2d Cir. 2009) (citation omitted). Moreover, "[e]ven if the person giving consent in fact lacked authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." Id.; see also Andreno, 505 F.3d at 209 ("[E]ven if a third party lacks actual authority to consent to a search of a particular area, he may have apparent authority to consent to the search."). "[D]etermination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the

---

[8] Defendant does not specifically object to Judge Pohorelsky's recommendation that his motion to suppress the firearm and ammunition be denied on the grounds that the CW had the apparent authority to consent to the search of the bedroom, nor to his recommendation to deny Defendant's Seibert claim. Rather, he generally "continue[s his] motion to suppress," and only makes "specific objections" to other portions of the R&R. (Def. Obj. at 1.) This failure may very well permit the court to review the R&R for clear error. See United States v. Simpson, No. 10-CR-0836 (RRM) (JO), 2012 WL 628497, at *1 (E.D.N.Y. Feb. 27, 2012) ("When a party makes only conclusory or general objections [to an R&R], or simply reiterates the original arguments, the court will review the report strictly for clear error."). In an abundance of caution, however, the court reviews the entirety of Judge Pohorelsky's R&R de novo. See id. ("However, in an abundance of caution, this Court has conducted a *de novo* review of [the] record and the magistrate judge's thorough and well-reasoned R&R . . . .").

premises?" Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). If so, despite the officer's reasonable mistake, "the search is valid." Id. However, the "apparent authority rule applies [only] to mistakes of fact [and] not mistakes of law." Andreno, 505 F.3d at 209 (citation omitted) (alterations in original).

Here, as Judge Pohorelsky correctly determined, assuming that the CW did not have *actual* authority to consent to the search of the bedroom,[9] the police's warrantless search comported with the Fourth Amendment because it was objectively reasonable for the officers to believe that she had the authority to consent. (See R&R at 10-11.) First, it is clear that the CW actually consented to the search. When asked where the firearm was located, the CW specifically directed the police into the bedroom.[10] (See id. at 52:12-15, 53:8-12, 130:4-13; cf. Def. Aff. ¶ 4 ("[T]he officers asked [the CW] 'where is it?' She walked into my bedroom and told the officers 'it's right here.'").)

Second, as the police entered the apartment, all indications were that Defendant and the CW were living together and that the CW had "common authority" over the bedroom. McGee, 564 F.3d at 139 (citation omitted). The 911 operator had told the officers that the CW was Defendant's girlfriend and that the gun was located on "the"—as opposed to "his"—bed. (See Gov't Ex. 3-B.) The CW herself told the officers this. (See Tr. at 46:2-47:1, 47:13-24, 74:8-24,

---

[9] As Judge Pohorelsky noted, it seems as though the CW actually had common authority over Defendant's bedroom. (See R&R at 9-10.) Indeed, Defendant's only evidence that he had any expectation of privacy in the bedroom is his affidavit swearing that the bedroom was his and that the CW was his "roommate." (See Def. Aff. ¶¶ 3-4.) Since it is clear that the CW had apparent authority to consent, the court need not decide whether she had "actual" authority to do so.

[10] That the CW apparently did not explicitly give her verbal consent to search the bedroom (even though Defendant seems to make this precise point (see Def. Aff. ¶ 4)), is of no moment. "[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981); see also United States v. Grant, 371 F. App'x 228, 229 (2d Cir. 2010). At a minimum, the CW pointed and directed police to enter the bedroom; the Government has therefore met its burden to establish her voluntary consent.

9

75:23-25, 124:6-13, 129:19-130:1, 139:25-140:11, 156:12-16.)  The CW also specifically told the police that she leased the apartment.  (Id. at 47:10-12, 74:25-75:9.)  The CW opened both the building and apartment doors with her keys.  (See id. at 47:25-48:8, 48:21-49:15, 125:7-11, 126:1-10; cf. id. at 124:18-24.)  Moreover, the police were only aware of one bedroom during their time inside the apartment, further suggesting that both the CW and Defendant slept together in the same room.  (See id. at 89:1-3, 114:6-7.)  Neither officer recalled that the bedroom had any indicia of a man's bedroom.  (Id. at 88:23-90:3; cf. id. at 150:23-151:12, 156:17-20.)  Based on these facts, the officers had a reasonable basis to believe that the CW had "common authority" over the bedroom and was capable of consenting to the searches that resulted in the seizure of the firearm and ammunition.[11]  For this reason, the warrantless search of the bedroom was valid; the court adopts this portion of the R&R, and denies this much of Defendant's motion to suppress.[12]

### B. Defendant's Statements Made to Police at Brooklyn Central Booking

#### 1. Seibert Claim

In Missouri v. Seibert, 542 U.S. 600 (2004), a fractured Supreme Court held that "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession" was unconstitutional.  542 U.S. at 604 (plurality opinion).  There, the police sought to first obtain a confession from a suspect, then administer the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966) and

---

[11] It should be clarified that, if anything, the police made an objectively reasonable *factual* mistake as to whether the CW had authority to consent to the bedroom's search.  The police did not make an erroneous *legal* determination and believe that they were entitled to search the bedroom only because the CW was Defendant's roommate.  At most, the police mistakenly believed that the CW was Defendant's girlfriend and shared the bedroom, which, if true, validated the CW's consent.  Cf. United States v. Brown, 961 F.2d 1039, 1041 (2d Cir. 1992) ("[The apparent authority rule] would not validate . . . a search premised upon an erroneous view of the law.  For example, an investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." (citations omitted)).

[12] Because this ground is sufficient to deny Defendant's motion, the court need not, and therefore does not, address Defendant's objections to the portions of Judge Pohorelsky's R&R that recommend denying Defendant's motion to suppress this evidence on other grounds.  Accordingly, the court does not adopt those sections of the R&R.

10

re-interrogate the suspect so that this latter confession could be used at trial.  See Seibert, 542 U.S. at 609-10 (plurality opinion).  This "evinced a police strategy adapted to undermine the effectiveness of the warnings when given" and circumvent the goal of Miranda.  United States v. Williams, 681 F.3d 35, 40 (2d Cir. 2012) (describing the plurality opinion in Seibert).

Justice Kennedy concurred in the judgment in Seibert, but believed that the plurality's suggestion that unintentional two-stage interrogations were unconstitutional "cut[] too broadly." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  He believed that a voluntary, post-warning confession is inadmissible only if elicited as part of a "deliberate" two-step strategy designed to evade Miranda and not remedied by "curative measures," such as a "substantial break in time and circumstances," or "an additional warning that explains the likely inadmissibility" of the pre-warning statements.  Id.  These "curative measures" ensure that "a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver."  Id.  If there was no "deliberate" strategy at all, the admissibility of the post-warning statement should be governed by Oregon v. Elstad, 470 U.S. 298 (1985), which asks whether the confession was made knowingly and voluntarily, id. at 309.  Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

The Second Circuit has since held that Justice Kennedy's concurrence is controlling, United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007), and that the Government bears the burden to prove by a preponderance of the evidence that the interrogations were not part of a deliberate two-step scheme designed to circumvent Miranda, United States v. Capers, 627 F.3d 470, 480 (2d Cir. 2010).

To determine "deliberateness," courts must evaluate "the totality of the objective and subjective evidence surrounding the interrogations."  Id. at 479.  "[I]n reviewing the subjective

evidence, 'closer scrutiny' should be given to an 'investigator's testimony . . . when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the totality of the circumstances.'" Williams, 681 F.3d at 43 (second alteration in original) (quoting United States v. Moore, 670 F.3d 222, 229 (2d Cir. 2012)). Legitimate reasons for delay in administering Miranda warnings include "officer or community safety or when delay is a product of a 'rookie mistake,' miscommunication or 'a momentary lapse in judgment.'" Moore, 670 F.3d at 229 (quoting Capers, 627 F.3d at 482). However, "if it is found, after weighing the investigator's credibility, that the investigator's intent was not 'calculated . . . to undermine Miranda,' delay will not require exclusion of the later, warned statement even if the court finds that the delay was for an illegitimate reason and even in the absence of curative measures." Id. (alteration in original) (citation omitted).

The court must also consider objective criteria, which are "guided by, but not limited to, the five factors identified by the plurality in Seibert." Williams, 681 F.3d at 44. The Seibert plurality examined:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615 (plurality opinion). For example, the court in Williams reversed a district court's order suppressing the defendant's statements made after waiving his Miranda rights where: (1) "the questions and answers in the first round of interrogation were neither complete nor detailed"; (2) the defendant's "statements at the apartment and at the station house did not 'appreciably overlap'"; (3) although there was "some continuity of personnel," the first interrogation "took place during the execution of a warrant in a residential setting and was

12

spontaneous and somewhat frenzied . . . just after [the apartment] had been secured by NYPD personnel," while the second was "in a small room at the station house almost two hours later" with the defendant "calmly seated across a table from [the officers] uncuffed"; and (4) "nothing in the record[] indicate[d] that [the officer] treated the second round as continuous with the first." Williams, 681 F.3d at 44-45.

By contrast, the court in Capers reversed the district court's denial of a suppression motion where: (1) "there [was] considerable overlap between the statements elicited from the defendant during the first and second interrogations," which were conducted approximately ninety minutes apart; (2) "[f]or the most part there was . . . continuity in the officers present at both locations"; (3) "[w]hile the location of the interrogation sessions changed [from] a room at the post office, the inquisitorial environment of the questioning was consistent"; and (4) the defendant was handcuffed the entire time. Capers, 627 F.3d at 483-84.

Here, as Judge Pohorelsky rightly concluded, Defendant's Seibert claim fails because the police did not employ a deliberate two-step technique designed to avoid Miranda. (See R&R at 7-8.) For one thing, the subjective evidence clearly favors the Government. Officer Gatling testified that when he asked one question of Defendant in the apartment, he did not intend to elicit a confession or avoid advising Defendant of his Fifth Amendment rights. (Tr. at 56:10-15.) Similarly, Detective Ujvary testified that he interrogated Defendant not as part of a deliberate scheme to avoid Miranda, but to ascertain "how he came in contact with th[e] firearm, and if he had any knowledge of any other criminal activity[, including] the sale of illegal firearms in New York City." (Id. at 164:9-13.) The delay in administering the Miranda warnings was perfectly legitimate—Defendant had to be transported to a new facility, and NYPD protocol instructed that a member the Gun Enhancement Unit question Defendant to determine whether he could provide

13

information regarding other illegal gun activity. (See id. at 159:24-160:6, 161:8-10.) Therefore, no subjective evidence suggests that either Officer Gatling or Detective Ujvary questioned Defendant as part of an attempt to deliberately circumvent Miranda. See Moore, 670 F.3d at 229.

Nearly all of the objective criteria also weigh against Defendant's Seibert claim. First, the initial "interrogation"—if Officer Gatling's lone question can even constitute an "interrogation"—was neither complete nor detailed. When asked generally if the firearm belonged to him, Defendant only stated that it did and that he intended to turn it in to the local police precinct. (Tr. at 55:8-12, 128:17-24, 148:16-149:5; Def. Aff. ¶ 6.) Neither Officer Gatling nor Officer Enriquez posed any follow-up questions nor elicited any further detail at that time, which counsels against Defendant's Seibert claim. See Williams, 681 F.3d at 44 ("[T]he questions and answers in the first round of interrogation were neither complete nor detailed. . . . The two-stage interrogation strategy described in Seibert, by contrast, was 'systematic, exhaustive, and managed with psychological skill,' leaving 'little, if anything, of incriminating potential unsaid.'" (quoting Seibert, 542 U.S at 616 (plurality opinion))).

Second, the two rounds of questioning were separated in both time and setting. The first, a very brief exchange at approximately 1:30 p.m., occurred at the scene of arrest while Defendant was handcuffed. (See Compl. ¶ 2; Tr. at 53:19-55:12.) The second was a formal interrogation that took place more than seven hours later at Brooklyn Central Booking. (See Tr. at 160:21-161:10, 164:14-166:18; Def. Aff. ¶ 7.) The two situations could hardly be less alike. See Williams, 681 F.3d at 44-45 (contrasting an "initial questioning [that] took place during the execution of a warrant in a residential setting and was spontaneous and somewhat frenzied," with "[t]he second interrogation [that] took place in a small room at the station house almost two

14

hours later [where the defendant] was calmly seated across a table from [the police]"). This strongly weighs in favor of the Government.

Third, there was no "continuity of police personnel." Seibert, 542 U.S. at 615 (plurality opinion). At the apartment, only Officer Gatling, in Officer Enriquez's presence, questioned Defendant. (See Tr. at 55:8-12, 128:17-24, 148:16-149:5.) At Brooklyn Central Booking, Detective Ujvary—having never spoken to the arresting officers (id. at 163:10-23, 175:18-23)—formally interrogated Defendant alongside Detective Miata.

And finally, there is no indication that Detective Ujvary treated the second interrogation as an extension of the first. Indeed, Detective Ujvary was not even aware that Defendant had made a previous statement, and never questioned Defendant on his remarks to Officer Gatling. (See id. at 163:10-20, 168:21-24.) Cf. Seibert, 542 U.S. at 605 (plurality opinion) ("[The interrogating officer] testified that he made a 'conscious decision' to withhold Miranda warnings, thus resulting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'").

The only factor that arguably supports Defendant's Seibert claim is that the two sets of statements overlap. Although the interrogation at Brooklyn Central Booking was much more expansive and detailed, in both instances Defendant stated that he owned the gun and that he intended to turn it in to the police. (See Tr. at 55:19-25, 167:6-24.) This lone factor, however, does not outweigh all other indications that counsel against Defendant's Seibert claim. See Moore, 670 F.3d at 230 ("In considering whether the government has demonstrated that it did not engage in a deliberate two-step process designed to thwart [the defendant's] Miranda rights, we 'review the totality of the objective and subjective evidence surrounding the interrogations'

15

. . . ." (citation omitted)). All told, the Government has easily met its burden in proving that Defendant was not subjected to a deliberate two-step interrogation designed to evade Miranda.[13] The court therefore adopts Judge Pohorelsky's R&R on this point and denies Defendant's Seibert claim.

### 2. 18 U.S.C. § 3501(c)

Defendant argues that Judge Pohorelsky erroneously recommended that the statements made at Brooklyn Central Booking not be suppressed pursuant to 18 U.S.C. § 3501(c). (Def. Obj. at 1-2.) He is mistaken.

Section 3501(c) provides, in pertinent part, that in any federal criminal prosecution,

> a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States . . . if such confession is found by the trial judge to have been made voluntarily and if . . . such confession was made or given by such person within six hours immediately following his arrest or other detention.

18 U.S.C. § 3501(c). The Supreme Court has interpreted the phrase "arrest or other detention" to mean one predicated on "a violation of *federal* law." United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994). Therefore,

> [i]f . . . the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated. This is true even if the arresting officers . . . believe or have cause to believe that the person also may have violated federal law. . . . As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered.

Id.; see also United States v. Frank, 8 F. Supp. 2d 284, 298-99 (S.D.N.Y. 1998) ("Because Frank

---

[13] Even if the police had used a deliberate two-step strategy, it appears that "curative measures" were taken, which, as Justice Kennedy has suggested, could independently warrant the admission of Defendant's statements made at Brooklyn Central Booking. See 542 U.S. at 622 (Kennedy, J., concurring). Here, there was a "substantial break in time and circumstances between the prewarning and the Miranda warning," which likely "ensure[d] that a reasonable person in [Defendant's] situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Id.; see also Moore, 670 F.3d at 228.

16

had not been charged with a federal offense at the time that he was held in custody in Florida, his effort to invoke § 3501 as a basis for the suppression of his statements must fail.").

Despite this clear rule, Alvarez-Sanchez identified in dicta "one presumably rare scenario" that might warrant a different analysis: "[I]f state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment," 18 U.S.C. § 3501(c) might apply even if the defendant had not been charged with a federal crime. 511 U.S. at 359; see also Anderson v. United States, 318 U.S. 350, 356 (1943) (holding that confessions that were "improperly" secured as part of an impermissible "working arrangement" between state and federal officers were inadmissible).

Here, Defendant was unquestionably held in NYPD custody for a violation of state law when he spoke with Detective Ujvary at Brooklyn Central Booking. (See Tr. at 107:12-14.) The Complaint and Arrest Warrant in his federal case were not issued until August 9, 2012—five days after this interrogation. (See Compl.; Arrest Warrant.) Defendant was not arrested by federal agents until August 10, 2012. (See Aug. 10, 2012, Minute Entry (Dkt. 3).) Therefore, under Alvarez-Sanchez, because Defendant was not in custody for a violation of federal law when he made the statements at Brooklyn Central Booking, § 3501(c) does not apply.

Defendant does not contest the clear holding of Alvarez-Sanchez, but argues that his case is one of the "rare scenarios" that the Supreme Court suggested may warrant a different analysis. He points out that part of Detective Ujvary's job was to "evaluate a case to see if it qualified for federal prosecution," which he did prior to interrogating Defendant. (Def. Obj. at 1.) According to Defendant,

> the fact that the NYPD evaluates cases for federal referral based on certain enumerated factors, the fact that [Defendant's case] was identified as a case for

> federal referral prior to the questioning at Brooklyn Central Booking, and the fact that the Detective who questioned him was the one responsible for gathering the information about the offense and then making the referral for federal consideration demonstrates an intertwining of the state and federal enforcement agencies to an extent that it brings this case under the orbit of the exception noted in [Alvarez-Sanchez].

(Id. at 2.) He is wrong.

First, there is no indication that NYPD and federal officials acted in "collusion." Alvarez-Sanchez, 511 U.S. at 359. According to Defendant, the NYPD independently identifies whether certain cases are eligible for federal prosecution, and only then "refer[s them] for federal consideration." (Def. Obj. at 2.) Federal officials are not alleged to be involved in determining whether to refer cases for federal prosecution, but only decide whether to *accept* such referrals. This appears to be "routine cooperation between local federal authorities" that Alvarez-Sanchez found "wholly unobjectionable." 511 U.S. at 360.

More importantly, there is no indication that any alleged collusion *caused* Defendant's confession at Brooklyn Central Booking, which was made more than six hours after his arrest. See id. (identifying the "rare scenario . . . that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone *in order to allow the federal agents to interrogate him* in violation of his right to a prompt federal presentment" (emphasis added)). Officer Gatling, Officer Enriquez, and Detective Ujvary did not speak to any federal employees before Defendant made his inculpatory statements at Brooklyn Central Booking. No federal employee spoke with Defendant until after he made these statements. And even though Detective Ujvary had intended to tell his supervisors that Defendant's case was *eligible* for federal prosecution, this did not *cause* Defendant's confession—Detective Ujvary only intended to inform the Trigger Lock detectives of Defendant's eligibility, and was not aware that he would

18

ultimately be prosecuted federally.[14] (Tr. at 194:14-22.) Defendant's confession, therefore, could not have been produced by any alleged collusion. Accordingly, Defendant's attempt to characterize his case as "under the orbit of the exception" (Def. Obj. at 2) hinted at in Alvarez-Sanchez fails, and his motion to suppress the statements he made to police at Brooklyn Central Booking is denied.

### C. Defendant's Statements Made to Police at the Apartment

No party objects to Judge Pohorelsky's recommendation that Defendant's motion to suppress the statements made to police at the apartment be granted given the Government's representation that it will not use these statements in its case-in-chief at trial. (See R&R at 5.) The court therefore reviews this portion of the R&R for clear error. See Houston, 2013 WL 125929, at *1. Finding none, the court adopts this recommendation: the Government may only use the statements Defendant made at the apartment to police for rebuttal purposes should Defendant "open the door." (R&R at 5 (citing Harris v. New York, 401 U.S. 222 (1971)).)

## III. CONCLUSION

The court ADOPTS IN PART Judge Pohorelsky's R&R. Defendant's motion to suppress is GRANTED IN PART and DENIED IN PART: (1) Defendant's motion to suppress the firearm and ammunition seized is DENIED; (2) Defendant's motion to suppress the statements made to police at the apartment is GRANTED insofar as the Government may not introduce these statements in its case in chief at trial; and (3) Defendant's motion to suppress the

---

[14] The Trigger Lock detectives decide whether to refer a defendant's case to the United States Attorney's Office; only a very small portion of such referrals are actually accepted for prosecution. (Tr. at 170:5-171:2, 181:16-182:9.)

statements made to police at Brooklyn Central Booking is DENIED.

SO ORDERED.

Dated: Brooklyn, New York  
      March 6, 2013

/s/ Nicholas G. Garaufis  
NICHOLAS G. GARAUFIS  
United States District Judge